**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JING XI; YUXUAN WANG, LIANGXIAO FENG; YONGHUI HUO; WENMING LI; DENG XIAO; JIAYU WU; CINDY ASALI; HUIMING SHI; YINGXUAN WANG; and TIAN RUI, individually and on behalf of all others similarly situated,

*Plaintiffs,*

v.

U.S. IMMIGRATION FUND – NY LLC, 29TH AND 5TH FUNDING 100 GP, LLC; NICHOLAS A. MASTROIANNI, II; NICHOLAS A. MASTROIANNI, III; and OTERA CAPITAL INVESTMENTS IX INC.,

*Defendants.*

Case No. 1:26-cv-03298-VM

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL REQUESTED**

Plaintiffs Jing Xi, Yuxuan Wang, Liangxiao Feng, Yonghui Huo, Wenming Li, Deng Xiao, Jiayu Wu, Cindy Asali, Huiming Shi, Yingxuan Wang, and Tian Rui, individually and on behalf of all others similarly situated, (collectively, "Plaintiffs" or "Class Representatives"), by and through their undersigned attorneys, for their First Amended Class Action Complaint against Defendants U.S. Immigration Fund – NY LLC ("USIF"), 29th and 5th Funding 100 GP, LLC ("the Manager" or "GP"), Nicholas A. Mastroianni, II ("Mastroianni II"), Nicholas A. Mastroianni, III ("Mastroianni III") (together the "USIF Defendants"), and Otera Capital Investments IX Inc. ("Otera") (collectively, "Defendants"), allege, as follows:

## NATURE OF THE ACTION

1. This is a class action brought on behalf of approximately 160 EB-5 immigrant investors (the "Class" or "Investors") who each invested at least $560,000 (consisting of a $500,000 capital contribution plus a $60,000 administrative fee) in 29th and 5th Funding 100,

LLC (the "Company"), a Delaware limited liability company organized and managed by the USIF Defendants for the sole purpose of making a preferred equity investment (the "Investment") in a real estate development project located between West 29th and 30th Streets and Fifth Avenue and Broadway in New York, New York (the "Project" or the "29th & 5th Project"). The Company was formed as a "New Commercial Enterprise" under the federal EB-5 Immigrant Investor Program ("EB-5 Program"), which permits foreign nationals to obtain conditional and ultimately permanent United States residency through qualifying capital investments that create American jobs.

2. Plaintiffs bring this action against the USIF Defendants for violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, fraud and fraudulent concealment, negligent misrepresentation, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract and the implied covenant of good faith and fair dealing, unjust enrichment, equitable accounting, civil conspiracy, and negligent supervision, arising from the USIF Defendants' knowing misrepresentations and concealment of material facts—including the developer's extensive litigation history, serial criminal misconduct, and financial collapse—which directly and proximately caused the total loss of Plaintiffs' and the Class's investments, aggregating no less than $80,000,000 in capital contributions plus $9,600,000 in administrative fees, and caused irreparable harm to Plaintiffs' and the Class's immigration prospects under the EB-5 Program.

3. Plaintiffs additionally bring claims for breach of contract against Defendant Otera Capital Investments IX Inc. ("Otera") arising from Otera's breach of its notice, cure, and purchase option obligations under the Tri-Party Recognition Agreement dated July 15, 2019 (the "Tri-Party Agreement"), which deprived the EB-5 investor entities of their contractual rights and

contributed to the total loss of the Investment.

4. This Complaint does not plead fraud "by hindsight." The fraud began before a single investor dollar was deployed. By the time the USIF Defendants disseminated the Confidential Offering Memorandum (the "PPM" or "Memorandum" annexed hereto as ***Exhibit "1")*** on October 18, 2018, the developer, HFZ Capital Group LLC ("HFZ"), had already been named in over 60 lawsuits involving allegations of fraud, breach of contract, and negligence—including lawsuits arising from other EB-5 projects. HFZ's Managing Principal, Nir Meir, had already begun a multi-year scheme to misappropriate millions of dollars from HFZ. And the Manhattan District Attorney later confirmed that HFZ's criminal diversion of trust funds from this very Project began in 2018—two full years before the COVID-19 pandemic. These were not unknowable future events; they were knowable, known, or recklessly disregarded facts that the USIF Defendants had a duty to investigate and disclose and that the USIF Defendants concealed from Investors while collecting millions in fees.

5. Nor can the USIF Defendants take refuge in the PPM's boilerplate risk disclosures. The "bespeaks caution" doctrine protects forward-looking statements accompanied by meaningful cautionary language, not historical or present-tense misstatements and omissions of fact. *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("The 'bespeaks caution' doctrine . . . is not . . . available to immunize an issuer from liability for false statements of historical or current fact.").

6. When the USIF Defendants themselves described HFZ as a company with "expertise in a broad range of real estate disciplines, including underwriting, analytics, structured finance, investment, development, construction and asset management" (***Exhibit "1"*** at 1), that was not a cautioned-against forecast; it was an affirmative, present-tense representation of HFZ's

qualifications that omitted HFZ's 140+ lawsuits, multiple EB-5 foreclosures, and internal fraud. Generic warnings about "risks" do not cure the omission of specific, known, adverse facts about the developer's track record. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016); *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 613–14 (S.D.N.Y. 2008) (finding that cautionary language did not "affect the total mix of information" so as to render reliance on defendants' alleged misrepresentations and omissions unreasonable).

7. Moreover, the PPM itself contained an admission fatal to any "bespeaks caution" defense. The PPM disclosed that "none of the Company, the Manager or the USIF New York Regional Center or any of their respective affiliates have undertaken any independent investigation to confirm the accuracy or completeness of" the financial information provided by HFZ. *See* PPM annexed hereto as ***Exhibit "1"*** at p. ix. This disclaimer, far from shielding Defendants, constitutes an admission that Defendants deliberately chose *not* to verify the accuracy of the developer's representations—a conscious decision to remain ignorant of readily discoverable red flags, which supports a strong inference of deliberate recklessness. A deliberate decision not to investigate a developer's background when one's sole business is deploying investor capital into that developer's projects is precisely such an extreme departure. *Id.* Recklessness in the securities fraud context implies an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. Such is the case here.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because Plaintiffs assert claims arising under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

thereunder, 17 C.F.R. § 240.10b-5. This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because those claims arise from the same case or controversy as the federal securities claims.

9. This Court has personal jurisdiction over all Defendants. USIF and the Manager are organized under the laws of the State of New York and the State of Delaware, respectively, and conducted substantial business in this District. The operative offering documents provide that litigation regarding the Project shall be prosecuted exclusively in the state or federal courts residing in this District.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, because a substantial part of the events and omissions giving rise to the claims occurred in this District, including the solicitation and sale of securities, the management and oversight of the Investment and the Project, and the ultimate loss of Investors' capital through the UCC foreclosure sale conducted in Manhattan.

**APPLICABLE LAW**

11. The Operating Agreement of 29th and 5th Funding 100, LLC, as set forth in the PPM at ***Exhibit "1"*** annexed hereto provides at Section 20(c): "The laws of the State of Delaware, without regard to its laws of conflicts, will govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Members." Accordingly, all state law causes of action herein are brought under the substantive law of the State of Delaware, as the controlling state law designated in the PPM and Operating Agreement.

12. To the extent that any cause of action herein is governed by federal securities laws, the PSLRA, 15 U.S.C. § 78u-4, and Federal Rule of Civil Procedure 9(b) apply. All allegations of fraud and fraudulent concealment are stated with the particularity required by Rule

9(b) and the PSLRA, specifying the who, what, when, where, and how of each alleged misrepresentation or omission, and stating with particularity facts giving rise to a strong inference that each Defendant acted with the required state of mind.

**THE PARTIES**

13. Plaintiffs are eleven (11) individual EB-5 immigrant investors, each of whom is a citizen and resident of the People's Republic of China or another foreign nation, and each of whom purchased one or more Units in the Company at an offering price of $560,000 per Unit (consisting of a $500,000 capital contribution plus a $60,000 administrative fee) pursuant to or traceable to the Offering Documents. A list of the putative class plaintiffs by country of origin and WAC number is annexed hereto as ***Exhibit "2."***

14. Each Plaintiff entered into a Subscription Agreement with the Company, executed or caused to be executed a Joinder to Escrow Agreement with Signature Bank (the "Escrow Agent"), executed the Operating Agreement, and remitted the full offering price to the Escrow Agent as directed by Defendants.

15. Each Plaintiff invested in the Company in reliance upon Defendants' representations in the Offering Documents, including representations concerning the Project's viability, the developer's creditworthiness, the USIF Defendants' respective oversight obligations, and the immigration benefits to be obtained through participation in the EB-5 Program.

16. Defendant U.S. Immigration Fund – NY LLC ("USIF") is a New York limited liability company with its principal place of business at 115 Front Street, Suite 300, Jupiter, Florida 33477. USIF served at all relevant times as the USIF New York Regional Center, an entity approved by United States Citizenship and Immigration Services ("USCIS") as a regional

center under the EB-5 Program to undertake EB-5 capital investment projects in the New York City area. USIF received substantial fees and other compensation in connection with the Investment and the Company.

17. Defendant 29th and 5th Funding 100 GP, LLC (the "Manager" or "GP") is a Delaware limited liability company with its principal place of business at 115 Front Street, Suite 300, Jupiter, Florida 33477. The Manager is the managing member of the Company and is an affiliate of USIF, controlled by Mastroianni II. The Manager was responsible at all relevant times for all decisions of the Company pertaining to the deployment of the Offering proceeds, the making of the Investment, and the operations of the Company. The Manager received placement fees, origination fees, application fees, an annual management fee equal to one percent (1.0%) of the current return earned on the Investment, and other compensation paid by the Project Owner and its affiliates.

18. Defendant Nicholas A. Mastroianni, II ("Mastroianni II") is an individual who, at all relevant times, served as the founder, chairman, manager, and controlling principal of USIF, the Manager, and their affiliated entities. As a controlling person of all of these entities, Mastroianni II exercised dominion and control over the Company, the Manager, and USIF. He made or approved all material decisions regarding the Company's operations, the solicitation of investments, the selection of the developer, the structuring of the Investment, and the deployment of investor capital. Mastroianni II personally signed or caused to be signed the Offering Documents and the Operating Agreement. In addition to being named in numerous lawsuits by dozens of other EB-5 investors, Mastroianni II had also been accused of financial improprieties by USIF's own former CFO, David Finkelstein, who in 2015 made counterclaims in a lawsuit alleging financial misconduct by Mastroianni.

19. Defendant Nicholas A. Mastroianni, III ("Mastroianni III") is an individual who, at all relevant times, served as the President of USIF and the Senior Vice President responsible for overseeing all marketing initiatives of the Regional Center, including managing relationships with foreign agents and finders who introduced prospective foreign investors to the capital investment projects. Mastroianni III developed and managed all marketing materials delivered to foreign agents, which materials contained or incorporated by reference the representations in the Offering Documents. ***Exhibit "1"*** at 115–16.

20. Defendant Otera Capital Investments IX Inc. ("Otera" or the "Senior Lender") is a Quebec corporation with an address at c/o Otera Capital Inc., 55 University Avenue, Suite 1701, Toronto, Ontario M5J 2H7. Otera served as the administrative agent and senior lender on the Project, providing loans to Owner in the maximum aggregate outstanding principal amount of up to $147,705,000, secured by first-priority mortgages on the Property. Otera is a party to the Tri-Party Recognition Agreement dated July 15, 2019, among Otera (as Administrative Agent), the Mezzanine Lender, and the EB-5 investor entities (as Investors). Pursuant to a Joinder dated December 14, 2020, 29th and 5th Funding 100, LLC became a party to the Tri-Party Agreement as an "Investor" thereunder. The Tri-Party Agreement imposed specific contractual obligations on Otera with respect to notice, cure rights, and purchase option rights for the benefit of the Investors.

**RELEVANT NON-PARTIES**

21. 29th and 5th Funding 100, LLC (the "Company") is a Delaware limited liability company organized by Defendants for the purpose of making the Investment in the Project under the EB-5 Program.

22. HFZ Capital Group LLC ("HFZ" or the "Developer") is a Delaware limited

liability company based in New York, which operated as a developer, often through subsidiaries. HFZ was the developer of the Project. HFZ is owned by Ziel Feldman, Helene Feldman, and the Feldman Family 2007 Trust.

23. Collegiate Asset Management Corp. ("CAM") is a nonprofit organization that provides investment management services to the Collegiate Church Endowment. CAM was the capital partner of HFZ in the Project.

24. HFZ KIK 30th Street LLC ("Common Member") is a Delaware limited liability company that served as the joint venture vehicle between HFZ and CAM through which the Project was developed and managed.

25. HFZ KIK 30th Street Holdings LLC ("Holding Company") is a Delaware limited liability company and the entity in which the Company made its preferred equity investment.

26. HFZ KIK 30th Street Mezzanine LLC ("Mezzanine Borrower") is a Delaware limited liability company and a wholly-owned subsidiary of the Holding Company.

27. HFZ KIK 30th Street Owner LLC ("Owner") is a Delaware limited liability company that owned the real property comprising the Project site—Block 831, Lots 28, 29, 30, 48, 49, 50, 51, and 52, as well as development rights appurtenant to those parcels—located between West 29th and 30th Streets and Fifth Avenue and Broadway in New York, New York.

28. VBGO Collegiate Tower LLC (the "Mezzanine Lender") is a Delaware limited liability company affiliated with Vanbarton Group LLC, which served as the mezzanine lender to the Mezzanine Borrower.

29. Mark Giresi ("Giresi") is an individual who, at all relevant times, served as the Chief Operating Officer and General Counsel of USIF, the Manager, and their affiliated entities. Giresi is a licensed attorney in the State of New Jersey with a Juris Doctor from Seton Hall Law

School and a Bachelor of Science in Accounting from Villanova University. Giresi had primary responsibility for the due diligence, legal review, and compliance functions of the Company under the supervision of the Mastroiannis.

30. Brian Friedman ("Friedman") is an individual who, at all relevant times, served as the Chief Financial Officer of USIF, the Manager, and their affiliated entities. As CFO under the supervision of the Mastroiannis, Friedman was responsible for the financial oversight, accounting, and reporting functions of the Company and was responsible for ensuring the accuracy of the financial representations contained in the Offering Documents.

31. Ziel Feldman ("Feldman") is an individual who, at all relevant times, was the principal owner and controlling person of HFZ Capital Group LLC.

## FACTUAL BACKGROUND

### The EB-5 Immigrant Investor Program

32. The EB-5 Immigrant Investor Program, created by Congress in 1990 pursuant to Section 203(b)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(5), allows foreign nationals to obtain conditional permanent residency in the United States by investing a specified minimum amount of capital in a "new commercial enterprise" that creates at least ten (10) full-time jobs for qualifying U.S. workers. At the times relevant to this Complaint, the minimum required investment in a Targeted Employment Area was $500,000.

33. Regional centers, such as USIF, are entities designated by USCIS to sponsor investment projects under the EB-5 Program. Regional centers are authorized to pool EB-5 investor capital and deploy it into job-creating projects.

34. The EB-5 Program imposes an "at-risk" requirement: investor capital must be placed "at risk" for the purpose of generating a return, and the investor must demonstrate a

sustained investment throughout the conditional residency period. Because EB-5 investors are, by definition, foreign nationals seeking immigration benefits, they are particularly vulnerable to exploitation. Many have limited familiarity with United States real estate markets, securities laws, and legal protections. They place extraordinary trust in the regional center sponsors and fund managers who solicit their investments.

35. The USIF Defendants organized the Company as a Delaware limited liability company on or about March 16, 2018, for the purpose of making a preferred equity investment in the Project. The Company was structured as a "New Commercial Enterprise" under the EB-5 Program, affiliated with the USIF New York Regional Center.

36. Beginning on or about October 18, 2018, and continuing through at least 2019, the USIF Defendants offered and sold or caused the offer and sale of Units in the Company to EB-5 investors pursuant to the PPM dated October 18, 2018, the Supplement No. 1 to the PPM dated May 20, 2019 (collectively, the "Offering Documents"), the Operating Agreement, the Subscription Agreement, the Escrow Agreement, and related documents. Each Unit was offered at a price of $560,000, consisting of a $500,000 capital contribution and a $60,000 administrative fee.

37. The PPM contemplated that the Company would sell up to 160 Units, raising a maximum of $80,000,000 in capital contributions plus $9,600,000 in administrative fees.

38. The Project involved the development of most of a city block between West 29th and 30th Streets and Fifth Avenue and Broadway in New York, into an ultra-modern, 551-foot-tall, 34-story office tower. According to the PPM, the Project Owner estimated the total cost of the Project at approximately $1.325 billion.

39. The Company's Investment took the form of a preferred equity interest in the

Holding Company. As a preferred equity investment, the Company's rights were subordinate to all senior debt and all other creditors of the Property Owner, and the Company did not benefit from a mortgage or any other collateral security interest.

40. The PPM, dated October 18, 2018, prepared under the direction and supervision of the Mastroiannis, reviewed by Giresi in his capacity as General Counsel, and with the financial representations reviewed by Friedman in his capacity as CFO, and disseminated to prospective investors through marketing channels managed by Mastroianni III, contained the specific affirmative misrepresentations, including the following. At page 1 of the PPM, the USIF Defendants stated that "HFZ Capital Group LLC" was "a Delaware limited liability company" and described the developer's role in the Project. At the PPM's "The Offering" section, the USIF Defendants further represented that HFZ was a company with "expertise in a broad range of real estate disciplines, including underwriting, analytics, structured finance, investment, development, construction and asset management" and that HFZ "capitalizes on development and investment opportunities both in the U.S. and abroad and has acquired, owned, developed and operated properties across many asset classes, including residential, hotel, retail, sports and entertainment." ***Exhibit "1"*** at 3.

41. These were not statements of opinion, aspirational puffery, or forward-looking projections; they were present-tense, factual representations about the developer's capabilities and track record. These representations were materially false and misleading because they affirmatively presented HFZ as a qualified, experienced developer while omitting the following specific, known, contrary facts:

(a) Between 2014 and 2019, HFZ was named in over 60 lawsuits involving allegations of fraud, breach of contract, and negligence. Since 2014, HFZ has been entrenched in

over 140 different legal actions. Many of these cases were in connection with EB-5 real estate development deals, and HFZ had undergone multiple foreclosures of its EB-5 projects.

(b) HFZ's managing principal, Nir Meir, had already begun a multi-year scheme to divert millions of dollars from HFZ, including submitting and approving over $11 million in fraudulent credit card reimbursements between 2016 and 2020, causing HFZ to wire millions directly to himself, and fabricating and forging documents to steal a $45 million beachfront Southampton property from HFZ.

(c) As later confirmed by the Manhattan District Attorney's indictment of February 7, 2024, and HFZ's guilty plea on August 6, 2024, HFZ's criminal misconduct at the very Project that is the subject of this Complaint—the NoMad office tower on West 30th Street—began in 2018, when HFZ began transferring trust assets legally required to be used only on this Project to different HFZ-controlled LLCs, totaling more than $107 million in four years, resulting in a shortfall of more than $24 million in stolen assets from this Project.

(d) HFZ had defrauded investors at multiple other projects, including diverting $253 million from its flagship XI project at 76 Eleventh Avenue, stealing $4.6 million from investors for a phony San Francisco development, and defrauding the City of New York of more than $15.6 million in property taxes.

(e) In separate litigation in New York Supreme Court, Arel Capital Partners obtained summary judgment against HFZ-related entities and Ziel Feldman for breach of fiduciary duty, with the court finding that HFZ had misappropriated approximately $26 million from investors and that Feldman had submitted a "false and misleading Officer's Certificate" to circumvent investors' priority rights. A default judgment was entered against HFZ-related entities in *Shabtai v. HFZ Capital Group*, in which the court found that the defendants had intentionally and in bad

faith converted a $3.5 million investment and then dissolved the entity to avoid paying the investor.

42. HFZ's criminal conduct at this very Project is not "fraud by hindsight." The Manhattan DA's indictment established that HFZ's lien law theft at the NoMad project began in 2018—two years before the pandemic—when HFZ began transferring trust assets, and that HFZ executive Anthony Marrone warned the construction manager, Pavarini McGovern LLC, not to notify the project lender about the missing funds, and that Meir made false promises and sent fictitious wire transfer confirmations to hide the theft. These contemporaneous facts were knowable to the USIF Defendants through customary due diligence and, upon information and belief, were in fact known to the USIF Defendants through their access to the developer's financial information.

43. The PPM represented that the Project Owner estimated the cost of the Project at approximately $1.325 billion and that the Project would be financed through a combination of senior debt (approximately $946,545,000), EB-5 investment ($10,000,000 to $80,000,000), and developer equity (approximately $298,455,000). The PPM further stated that the "Company will not fund the Investment unless the Project Owner shows to the Manager's satisfaction that it has procured commitments for all of the financing for the projected cost of the Project." ***Exhibit "1"*** at 28-9.

44. These representations were false and misleading because, at the time the PPM was prepared (October 2018) and at the time Investors' capital was deployed, the Project Owner had not secured a principal construction loan and had obtained only a pre-development mezzanine loan of up to $95,000,000 (later reduced to $90,943,500) and a mortgage loan of up to $147,705,000. These amounts, totaling approximately $242,705,000, represented only

approximately 18.3% of the $1.325 billion total Project cost. The financing gap of over $1 billion was so large as to render the Project's completion highly uncertain. The USIF Defendants reviewed the financial representations in the PPM and knew or were reckless in not knowing of this massive financing gap.

45. At the time of the July 13, 2018 closing of the mezzanine loan—just three months before the PPM was dated—the Project had an appraised value of only approximately $180 million to $190 million, a figure that was wholly inconsistent with Defendants' financing narrative and rendered the Investment impaired from inception. This appraised value was far below the $1.325 billion total Project cost represented in the PPM and far below the approximately $350 million value that HFZ claimed for the Property in April 2021.

46. The PPM disclosed that the Manager and USIF would receive "significant fees and other compensation from the Project Owner in connection with the Investment," and acknowledged that the "Manager would have an incentive to waive one or more of the conditions to the funding of the Investment because of the compensation payable to the Manager from such funding." This disclosure was materially misleading because it failed to disclose the specific magnitude of the fees Defendants would receive and failed to disclose that these conflicts had, in fact, already caused the USIF Defendants to place their own financial interests above those of the Investors. This is not a case where "generic" fee disclosures suffice; the PPM *affirmatively* represented that conditions to funding existed but then disclosed that Defendants had a financial incentive to waive those very conditions—without disclosing that this is precisely what they did and why.

47. At the times at which the PPM was caused to be disseminated by the USIF Defendants, they were defendants in a large lawsuit brought by EB-5 investors in the

Harbourside Project (the "Harbourside Litigation"). See ***Exhibit "3"*** annexed hereto. The PPM disclosed the existence of the Harbourside litigation but stated that "the defendants believe the claims are without merit" and that they "do not expect that the outcome will negatively impact the Company's business." ***Exhibit "1"*** at 61-2.

48. This disclosure was materially misleading because it minimized the significance of the Harbourside litigation, which was filed on October 11, 2018—just seven days before the PPM was dated—and alleged in extensive detail that Mastroianni II had engaged in a "carefully planned fraud" in which he controlled every aspect of an EB-5 investment structure, the investors' attorney publicly stated that "[t]his was fraud from the very beginning," and the complaint alleged that Mastroianni intentionally structured the deal to "wipe out" the EB-5 investors' position.

**Defendants' Knowledge and Scienter: Particularized Facts**

49. The following particularized facts, individually and collectively, give rise to a strong inference of scienter—an inference that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)—for each Defendant. In evaluating this inference, the Court must "consider all of the facts alleged, taken collectively," rather than scrutinizing each allegation in isolation. *Id.* at 323. Scienter may be established either "(1) by alleging facts to show that defendants had both motive and opportunity to commit fraud or (2) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)). Here, both pathways support a strong inference of scienter as to each Defendant:

50. Mastroianni II knew of HFZ's litigation history and financial distress because he, as the ultimate decision-maker for USIF and the Manager, selected HFZ as the developer of the $1.325 billion Project. Any minimally competent selection process would have revealed HFZ's 140+ lawsuits, including EB-5 project failures. Mastroianni II was a party to the Harbourside litigation, which alleged a substantially identical pattern of fraud by Mastroianni II himself, and was personally aware that EB-5 investors had accused him of orchestrating a "carefully planned fraud." Mastroianni II had previously been accused of financial improprieties by USIF's own former CFO, David Finkelstein. Mastroianni II had a concrete personal financial benefit from the fraud: he personally received fees contingent on the deployment of Investors' capital. This is not a "generic" corporate motive; Mastroianni II controlled both sides of the transaction—the entity deploying Investors' capital (the Manager) and the entity receiving fees from that deployment—and the PPM itself admitted he had "an incentive to waive one or more of the conditions to the funding of the Investment." ***Exhibit "1"*** at 61. Disclosure of such an incentive does not necessarily make exercise of that incentive proper.

51. Mastroianni III, as President of USIF and the person responsible for all marketing initiatives, developed and managed the marketing materials that incorporated the PPM's misrepresentations about HFZ. Mastroianni III managed relationships with the foreign agents who directly solicited the Class (including a captive sales force in China it managed that routinely appeared at events intended to market to both migration agents and prospective investors), making him the conduit through which the misrepresentations reached the Investors. As a member of the Mastroianni family that controlled USIF and the Manager, Mastroianni III had a concrete personal financial interest in the continued solicitation of investments. His knowledge is further supported by the small size and closely held nature of the USIF

enterprise—there were only four senior officers (Mastroianni II, Mastroianni III, Giresi, and Friedman)—which supports an inference that material information about HFZ's problems was known to all senior officers and thus all USIF Defendants.

52. All Defendants had access to material non-public information about HFZ and the Project through the Company's Investment in the Holding Company, through the Operating Agreement of the Holding Company, and through the Tri-Party Recognition Agreement among the Senior Lender, Mezzanine Lender, and the EB-5 Investors.

**Loss Causation**

53. On or about July 13, 2018, the Mezzanine Borrower entered into a Mezzanine Loan Agreement with the Mezzanine Lender in the maximum principal amount of $95,000,000 (later reduced to $90,943,500). The mezzanine loan was guaranteed by CAM, HFZ Capital, and Ziel Feldman on a joint-and-several basis. On the same date, Owner entered into mortgage loan agreements with the Senior Lender in the maximum aggregate outstanding principal amount of $147,705,000.

54. The mezzanine loan and the mortgage loan both matured on October 13, 2020. Both the Mezzanine Borrower and Owner failed to pay all amounts due on the maturity date. On November 27, 2020, the Mezzanine Lender delivered a Notice of Default. ***See Exhibit "4"*** annexed hereto. On December 1, 2020, the Senior Lender delivered a notice of default to Owner. ***See Exhibit "5"*** annexed hereto. On December 23, 2020, the Mezzanine Lender served a Notice of Sale pursuant to Article 9 of the UCC. ***See Exhibit "6"*** at 2. On March 9, 2021, an Amended Notice of Sale was served, postponing the sale to April 23, 2021. ***See Exhibit "7"*** at 2.

55. On or about April 22, 2021, the Company sought a temporary restraining order in the New York Supreme Court to prevent the UCC sale. The Court denied the TRO but

acknowledged that the Company could have a claim for money damages.

56. On April 23, 2021, the Mezzanine Lender conducted the UCC foreclosure sale. The Mezzanine Lender's $84.8 million credit bid was the sole bid at the sale, despite ninety potential bidders having signed confidentiality agreements granting them access to the Data Room. Not a single outside bidder submitted a bid. The sale rendered the Company's preferred equity investment entirely worthless.

57. COVID-19 did not cause Plaintiffs' losses; Defendants' misconduct did. The Project was highly unlikely to succeed before the pandemic because: (a) as of the October 18, 2018 PPM, HFZ had not obtained a principal construction loan, leaving a financing gap of over $1 billion; (b) the appraised value of the Property in July 2018 was only approximately $180–190 million, rendering the Investment impaired from inception; (c) HFZ's criminal diversion of trust funds from this very Project began in 2018, two years before the pandemic; and (d) HFZ's systematic fraud across multiple projects—including diverting $253 million from its XI project and stealing $4.6 million for a phony San Francisco development—reflected a developer that was financially incapable of completing the $1.325 billion Project regardless of the pandemic. The fact that not a single outside bidder submitted a bid at the April 23, 2021 UCC sale—despite ninety potential bidders having signed confidentiality agreements and accessed the Data Room—further confirms that the Project was valueless independent of any pandemic effects, because sophisticated real estate investors assessed the Project's merits in April 2021 and unanimously concluded it was not worth any investment at any price. Had COVID-19 been the cause of the Project's distress, one would expect at least one sophisticated bidder to view the pandemic as a temporary headwind and bid on the Project's long-term value. None of them did.

**Otera Capital's Contractual Obligations and Breaches Under the Tri-Party Recognition Agreement**

58. On July 15, 2019, Otera, the Mezzanine Lender, and the EB-5 investor entities (101 Murray Street Funding, LLC and AYB Funding 100, LLC) entered into the Tri-Party Recognition Agreement (the "Tri-Party Agreement"). On December 14, 2020, 29th and 5th Funding 100, LLC executed a Joinder to the Tri-Party Agreement, becoming an "Investor" thereunder and agreeing to be bound by its terms. ***See Exhibit "8"*** at 111. By executing the Joinder, the New Investor acknowledged receipt of the Mezzanine Lender's Notice of Default dated November 27, 2020.

59. Section 7(a) of the Tri-Party Agreement provides that "[p]rior to either Administrative Agent or Mezzanine Lender taking any Enforcement Action under the Senior Loan Documents or the Mezzanine Loan Documents, as applicable, Administrative Agent and Mezzanine Lender shall provide written notice of such default which would permit Administrative Agent or Mezzanine Lender to commence such Enforcement Action to Investor . . . and, if such default is a monetary default shall permit Investor an opportunity to cure such monetary default."

60. Section 7(b) of the Tri-Party Agreement specifically provides that if the default is a monetary default, the Investor shall have a "Monetary Cure Period" of three (3) business days after the later of (i) the Default Notice and (ii) the borrower's cure period to cure any monetary default, subject to a maximum of six (6) total cure exercises during the life of the loans.

61. Section 9(a) of the Tri-Party Agreement provides that upon a "Purchase Option Event"—defined as (i) acceleration of either the Senior Loan or the Mezzanine Loan, (ii) commencement of any Enforcement Action under the Senior Loan Documents or the Mezzanine Loan Documents, or (iii) either Borrower or Mezzanine Borrower becoming a debtor

in any proceeding—"Administrative Agent or Mezzanine Lender, as applicable shall provide written notice of same to Investor," thereby triggering the Investor's right to purchase the Senior Loan and Mezzanine Loan, in whole but not in part, for the Loan Purchase Price.

62. Section 9(b) of the Tri-Party Agreement further provides that the Investor's right to purchase the Senior Loan and Mezzanine Loan shall automatically terminate upon a transfer of the Property by foreclosure or a transfer of the Collateral by foreclosure, "provided that Administrative Agent and Mezzanine Lender shall ensure that the actions described in this clause (i) are done in a time and manner such to ensure that Investor will have at least ninety (90) days after its receipt of notice of the Purchase Option Event to close the purchase of the Senior Loan and the Mezzanine Loan."

63. Section 21 of the Tri-Party Agreement preserves Otera's discretion to "exercise all of Administrative Agent's and Lenders rights and remedies under the Senior Loan Documents including without limitation the commencement of foreclosure proceedings, make modifications, grant consents and otherwise deal with the Property or any other collateral under the Senior Loan Documents in the same manner and to the same extent as it would have been able to do had the Investment not been made by Investor." However, upon information and belief, Section 21 does not relieve Otera of the express notice and cure obligations set forth in Sections 7 and 9 of the Tri-Party Agreement.

64. Section 22 of the Tri-Party Agreement acknowledges that "a breach or default of this Agreement" would cause "irreparable harm" and provides that "the non-breaching or non-defaulting party shall be entitled to equitable relief, including the remedies of injunction, declaratory judgment and specific performance in addition to any and all other remedies at law or in equity."

65. On December 1, 2020, Otera issued a notice of default to Owner, citing, among other defaults, Owner's failure to pay all sums due under the Senior Loan on the maturity date of October 13, 2020, cancellation of required insurance policies, and the recording of mechanic's liens against the Property by Pavarini McGovern LLC. In the notice, Otera stated that "all sums outstanding under the Loan . . . shall be and are hereby declared to be immediately due and payable" and reserved all rights and remedies. ***Exhibit "7,"*** *supra*.

66. Upon information and belief, Otera's declaration that the Senior Loan was "immediately due and payable" constituted an acceleration of the Senior Loan within the meaning of Section 9(a)(i) of the Tri-Party Agreement, thereby triggering a Purchase Option Event. Upon information and belief, Otera failed to provide timely written notice of the Purchase Option Event to the Investors as required by Section 9(a) of the Tri-Party Agreement, or, alternatively, failed to ensure that the Investors had at least ninety (90) days after receipt of such notice to close the purchase of the Senior Loan and Mezzanine Loan as required by Section 9(b).

67. Upon information and belief, Otera took or threatened Enforcement Action under the Senior Loan Documents without first providing the Investors with the Default Notice required by Section 7(a) of the Tri-Party Agreement and without affording the Investors the Monetary Cure Period provided by Section 7(b). To the extent Otera did provide notice, upon information and belief, such notice was untimely, inadequate, or did not comply with the specific procedural requirements of Sections 7 and 9 of the Tri-Party Agreement.

68. Upon information and belief, Otera's breaches of the Tri-Party Agreement deprived the Investors of the contractual rights that could have preserved their Investments. Had Otera complied with its obligation to provide timely notice of the Purchase Option Event and to ensure that the Investors had at least ninety (90) days to close the purchase of the Senior Loan

and Mezzanine Loan, the Investors would have had the opportunity to acquire both loans for the Loan Purchase Price and thereby prevent the UCC foreclosure sale that rendered the Investment worthless. Investors never had the chance due to Otera's conduct.

**Factual Allegations Incorporated from the 29th and 5th Litigation**

69. As alleged in the complaint filed on September 9, 2021 by the General Partner of 29th and 5th Funding 100, LLC in the New York Supreme Court, New York County, Index No. 655407/2021 (the "GP Complaint" annexed hereto ***Exhibit "9"***), the UCC foreclosure sale conducted on April 23, 2021 was not conducted in a commercially reasonable manner. The Mezzanine Lender and the Church Defendants sabotaged the sale process and acted in a manner that knowingly and intentionally deterred potential bidders from making bids.

70. According to the GP Complaint, on March 31, 2021, counsel for the Church sent a letter to the Mezzanine Lender's counsel (the "RCL Letter"), asserting that the Church's prior transfers of a parcel known as Lot 30 and certain critical air rights to Owner were potentially voidable under Section 12 of the New York Religious Corporations Law because such transfers had not been approved by a court or the New York State Attorney General. The Church admitted in the RCL Letter that it was reversing the position it had "historically expressed" regarding the enforceability of those transfers.

71. The Mezzanine Lender caused the RCL Letter to be placed in the virtual Data Room established for potential bidders conducting due diligence in connection with the UCC sale, intending and expecting that its presence would discourage potential bidders from submitting bids so that the Mezzanine Lender could purchase the Owner LLC Interests through a below-value credit bid. Although ninety (90) potential outside bidders signed confidentiality agreements granting them access to the Data Room, not a single outside bidder submitted a bid.

The Mezzanine Lender purchased the Owner LLC Interests by credit-bidding the approximately $84.8 million allegedly owed to it, which was at least $100 million less than the actual value of the Owner LLC Interests.

72. According to HFZ Capital, by April 2021, the Property was worth at least $350 million, and, when completed, the Project was expected to return profits of $1 billion. On or about April 16, 2021, HFZ Capital, as a potential joint venturer of Buckingham Trading Partners Inc., executed a proposal letter proposing to make a $40 million preferred equity investment into the Project (the "Buckingham Proposal"). Neither the Mezzanine Lender nor the Church Defendants consented to, or made any attempt to pursue, the transaction envisioned by the Buckingham Proposal. Instead, while the nation was still in the midst of a global pandemic, the Mezzanine Lender refused to postpone the scheduled UCC sale of the Owner LLC Interests.

73. Upon information and belief, Otera was aware of the Buckingham Proposal, the Mezzanine Lender's scheduled UCC sale, and the Church's RCL Letter, and failed to take any action to protect the Investors' interests under the Tri-Party Agreement notwithstanding the Purchase Option Event triggered by Otera's own acceleration of the Senior Loan. Upon information and belief, Otera's failure to enforce the Investors' contractual rights under the Tri-Party Agreement, and its failure to ensure that the UCC sale process afforded the Investors at least ninety (90) days to exercise their purchase option, facilitated the Mezzanine Lender's acquisition of the Owner LLC Interests at the commercially unreasonable credit bid price of $84.8 million.

74. But for Defendants' wrongful conduct, Investors would not have purchased Units in the Company. Had HFZ's litigation history, internal fraud, financial distress, and the absence of construction financing been disclosed as it should have been, no reasonable investor would

have invested $560,000 in a preferred equity position in a $1.325 billion project developed by a company facing 140+ lawsuits, whose managing principal was stealing from the company, and that had not secured the principal construction loan.

**THE EXCULPATION CLAUSE DOES NOT BAR PLAINTIFFS' CLAIMS**

75. Section 8 of the Operating Agreement contains an exculpation clause purporting to eliminate "the liability of the Manager and its affiliates for any breach of any duties (including fiduciary duties) that the Manager and its affiliates may have to the Company or any Member." ***Exhibit "1"*** at 94. This clause does not protect Defendants in any manner whatsoever.

76. Under Delaware law, exculpation clauses may not eliminate liability for "any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing." 6 Del. C. § 18-1101(e). Bad faith under Delaware law includes "intentional dereliction of duty" and "a conscious disregard for one's responsibilities." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006). As the Delaware Supreme Court has explained, the implied covenant "requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005). The following particularized facts demonstrate that Defendants acted in bad faith, not mere negligence:

(a) The USIF Defendants admitted in the PPM that they "have [not] undertaken any independent investigation to confirm the accuracy or completeness" of the developer's financial information, a conscious decision to remain deliberately ignorant, which constitutes bad faith under Delaware law. ***Exhibit "1"*** at 14;

(b) The USIF Defendants continued to solicit investments while they were parties to

the Harbourside litigation—filed seven days before the PPM was dated—which alleged a substantially identical scheme of fraud, demonstrating a conscious pattern of misconduct.

(c) The USIF Defendants deployed Investors' capital knowing that the Project lacked a construction loan, that the financing gap exceeded $1 billion, and that the appraised value was only $180–190 million. Deploying $80 million of Investors' capital under these circumstances was not merely negligent; it was a conscious disregard for Investors' interests driven by the USIF Defendants' desire to earn fees.

(d) The USIF Defendants structured the Investment as an unsecured preferred equity interest—rather than a secured mezzanine loan—because the preferred equity structure provided the USIF Defendants with greater flexibility and higher fees, at the expense of Investors' protection. This deliberate choice to subordinate Investors' interests to the USIF Defendants' own financial interests constitutes bad faith.

77. Additionally, to the extent the exculpation clause purports to bar claims for fraud or violations of federal securities law, it is unenforceable as a matter of public policy. *See* 15 U.S.C. § 78cc(a).

**THE 2020 CONSENT RELEASE DOES NOT BAR PLAINTIFFS' CLAIMS**

78. On or about October 27, 2020, the USIF Defendants solicited from Plaintiffs and the Class the execution of a form document (the "Consent") authorizing the release of funds then held by the Escrow Agent. The Consent purported to release the Company, U.S. Immigration Fund, LLC, U.S. Immigration Fund – NY, LLC, the Developer, and their "predecessors, successors, subsidiaries, affiliates, officers, directors, general partners, managers, employees, attorneys, insurers, agents, representatives, immigration agents, placement agents, finders and assigns" from "any and all claims . . . known or unknown, suspected or unsuspected . . . ."

79. The Consent is void and unenforceable because it was procured by fraud. The Consent was accompanied and induced by a letter dated October 27, 2020 (the "October 2020 Letter"), transmitted by or on behalf of the USIF Defendants, which made affirmative, present-tense misrepresentations of material fact for the express purpose of obtaining Investors' signatures on the Consent and thereby obtaining the release of escrowed funds.

80. Because the Consent was solicited to authorize the release of funds held pursuant to the Escrow Agreement, it arises "under, in connection with, or in relation to" that Agreement. Section 17 of the Escrow Agreement selects the law of the State of New York pursuant to N.Y. Gen. Oblig. Law § 5-1401, and Section 13 of the Escrow Agreement designates the state and federal courts sitting in Manhattan as the exclusive forum. New York law therefore governs the validity and effect of the Consent, and this Court is the contractually designated forum.

81. Under New York law, a release is not enforceable where it was procured by fraud, and a releasor may challenge a release as fraudulently induced by identifying a fraud separate from the subject matter of the release itself. *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011); *Pappas v. Tzolis*, 20 N.Y.3d 228, 233 (2012). Moreover, a general release will not be construed to reach unknown claims unless it was "fairly and knowingly made." *Mangini v. McClurg*, 24 N.Y.2d 556, 566–67 (1969).

82. The fraud that induced the Consent is separate and distinct from the 2018 offering fraud that the Consent purports to release. The October 2020 Letter did not merely repeat the misrepresentations contained in the Offering Documents. It made new, independent misrepresentations concerning then-existing facts that post-dated the Offering by nearly two years, and it did so for the specific purpose of extracting a release. Specifically, and with the particularity required by Rule 9(b), the October 2020 Letter represented:

(a) That the job-creation requirement of the EB-5 Program had been "satisfied" as to "all current investors," and that 840 permanent jobs had been verified by an independent construction management firm as of September 23, 2020;

(b) That USCIS "deems the Project itself approved" and that subsequently filed I-526 petitions would accordingly receive "deference";

(c) That the Developer had invested $140,000,000 of its own equity into the Project; and

(d) That the I-526 petition insurance was "still active."

83. Each of these representations was false or materially misleading when made, and the USIF Defendants knew it. The representation concerning I-526 petition insurance is demonstrably false from the USIF Defendants' own offering document: the PPM states at page 112 that "No Member has any rights under such Policies," that the Policies "do not provide insurance coverage to Members," and that nothing in the Policy creates "any direct right of action" in favor of any Member. Representing to an Investor that insurance protecting that Investor's petition remained "active" was therefore false as a matter of the USIF Defendants' own documents.

84. The remaining representations were false or misleading because, as of October 27, 2020, the Project was in collapse and the USIF Defendants knew it. The same October 2020 Letter conceded that the Affiliate Financing buyout date of July 13, 2020, as extended to October 13, 2020, had passed; that amounts were "past due"; that no construction loan was in place; and that forbearance was then being negotiated. The Mezzanine Borrower and the Owner had failed to pay all amounts due at maturity on October 13, 2020. Representations that the Project stood "approved," that jobs had been verified, and that the Developer had funded $140,000,000 in equity, when juxtaposed against the concealed insolvency of the Project, were misleading half-truths designed to induce Investors to release their escrowed funds and their claims rather than to

demand a return of capital.

85. The USIF Defendants made these representations with knowledge of their falsity or with reckless disregard for their truth, and with the intent that Plaintiffs and the Class rely upon them in executing the Consent.

86. No provision of the Offering Documents bars this claim. Section 20(j) of the Operating Agreement is a general merger clause providing only that "[t]here are no agreements, understandings, restrictions, representations, or warranties among the parties other than those set forth in this Agreement." A general merger clause does not bar a claim for fraud in the inducement. *Rosenblum v. Glogoff*, 96 A.D.3d 514–15 (1st Dep't 2012). Only a specific disclaimer, tracking the precise representations alleged to be false, will do so, and no such disclaimer exists. *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320–21 (1959). The acknowledgment contained in paragraph 4 of the Pre-Subscription Letter is limited to "regulatory, tax and accounting treatment, investment suitability," and says nothing of job creation, USCIS status, developer equity, or insurance.

87. Plaintiffs' reliance on the October 2020 Letter was justifiable. The facts misrepresented were peculiarly within the USIF Defendants' knowledge and were not accessible to Investors: the independent economist's report, the construction-management verification of job creation, the status of USCIS deliberations, and the terms of the insurance policy were all in the exclusive possession or control of Defendants. Plaintiffs are foreign nationals residing outside the United States who had no independent means of verifying any of these matters.

88. The USIF Defendants solicited and accepted subscriptions from Investors who affirmatively disclosed that they were not accredited. On the Accredited Investor Status form, box (iii) was checked: "I do not satisfy either of the requirements set forth in (i) or (ii) above."

The USIF Defendants accepted a $560,000 subscription from a self-declared non-accredited foreign national and thereafter solicited from that same Investor a release of all claims.

89. The USIF Defendants further knew that they were contracting with persons who did not read English. The Pre-Subscription Letter provides:

> THIS AGREEMENT HAS BEEN INITIALLY WRITTEN IN THE ENGLISH LANGUAGE; IN THE EVENT OF ANY CONFLICT BETWEEN THE ORIGINAL ENGLISH VERSION AND ANY TRANSLATIONS INTO OTHER LANGUAGES, THE ORIGINAL ENGLISH VERSION SHALL CONTROL.

The USIF Defendants thus contemplated that the Offering Documents would be translated and contractually allocated all risk of translation error to the Investor. Plaintiffs do not contend that an inability to read English, standing alone, avoids the Consent. Plaintiffs allege that the recital in the Consent of an "opportunity to review this document . . . in his or her native language, if so desired" cannot cure an affirmative misrepresentation of fact, and that a sponsor who structures an offering around its investors' inability to read English while disclaiming the accuracy of any translation cannot claim that the resulting release was "fairly and knowingly made" within the meaning of *Mangini v. Clurg*.

90. Certain Plaintiffs and Class members were under the age of eighteen at the time the Consent was executed, and the Consent was executed on their behalf by a legal guardian. Under New York law, an infant's contract is voidable at the infant's election, and a guardian may not release an infant's claims without judicial approval. *See* CPLR 1207. The Consent is therefore void or voidable as to each such Plaintiff and Class member on the independent ground of incapacity, without regard to fraud.

91. Finally, to the extent the Consent purports to release claims arising under the federal securities laws, it is void as a matter of federal law. *See* 15 U.S.C. § 78cc(a); 15 U.S.C.

§ 77n.

## SLUSA DOES NOT PREEMPT PLAINTIFFS' STATE LAW CLAIMS

92. The Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. § 78bb(f)(1), preempts certain state law class action claims. However, SLUSA applies only to claims "in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1). A "covered security" is defined under Section 18 of the Securities Act of 1933, 15 U.S.C. § 77r(b), as a security listed on a national securities exchange or issued by a registered investment company. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 83 (2006) (explaining the definition of "covered security" under SLUSA).

93. The Units in the Company are not listed on any national securities exchange and the Company is not a registered investment company. The Units are exempt securities offered under Rule 506(c) of Regulation D—a private placement exemption—and are therefore not "covered securities" within the meaning of SLUSA. Securities offered under a Regulation D exemption are not "covered securities" because they are not "listed, or authorized for listing, on a national securities exchange" and are not issued by a registered investment company. *See* 15 U.S.C. § 77r(b)(1)–(2). Accordingly, SLUSA does not preempt Plaintiffs' state law claims, and all such claims are properly before this Court.

## STATUTES OF LIMITATIONS

94. Plaintiffs' federal securities fraud claims under Section 10(b) and Rule 10b-5 are timely. Under 28 U.S.C. § 1658(b), such claims must be brought within two (2) years after discovery of the facts constituting the violation, or within five (5) years after the date of the violation, whichever is earlier. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010) (holding that the limitations period begins when the plaintiff discovers, or a reasonably diligent plaintiff

would have discovered, the facts constituting the violation). The UCC foreclosure sale occurred on April 23, 2021, at which time the Investors first learned the full extent of their losses. Plaintiffs could not, in the exercise of reasonable diligence, have discovered the facts constituting the fraud prior to the defaults and foreclosure that commenced in October 2020. The full scope of HFZ's criminal conduct touching this very Project was not publicly confirmed until the Manhattan DA's indictment on February 7, 2024, and HFZ's guilty plea on August 6, 2024. Because the fraud was actively concealed by the USIF Defendants—who admitted in the PPM that they had not independently investigated HFZ's financial information—and because Plaintiffs were foreign nationals fully dependent on USIF for information given that they had no independent access to U.S. litigation records, the inquiry notice standard is not triggered by the mere public availability of court filings.

95. The USIF Defendants' likely argument that the statute of limitations began when investors made their investments—because HFZ's litigation history was "publicly available"—fails because the duty to investigate and disclose material information was Defendants', not Plaintiffs'. The PPM was a confidential offering memorandum provided to foreign nationals with limited familiarity with U.S. court records, and the PPM itself stated that it superseded and replaced "any and all information delivered or made available by or on behalf of the Company prior to the date of this Memorandum." Investors were entitled to rely on the PPM and were not on "inquiry notice" of facts that the USIF Defendants had a duty to disclose and deliberately concealed. Moreover, the full scope of HFZ's criminal conduct at this Project was not confirmed until the Manhattan DA's indictment on February 7, 2024, and HFZ's guilty plea on August 6, 2024.

96. Plaintiffs' Delaware common law claims are subject to a three-year statute of

limitations under 10 Del. C. § 8106, tolled by the discovery rule and the doctrine of fraudulent concealment. As required by Rule 9(b) and consistent with *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 150 (Del. 1987), Plaintiffs allege the following particularized facts establishing fraudulent concealment:

(A) The USIF Defendants had knowledge of the alleged wrong: Defendants knew of HFZ's extensive litigation history (over 140 lawsuits), Nir Meir's multi-year scheme to steal millions from HFZ, the absence of a principal construction loan, and the July 2018 appraised value of only $180–190 million rendering the Investment impaired from inception, as set forth in particularized detail in paragraphs 49-69, *supra*; and

(B) The USIF Defendants committed affirmative acts of concealment: Defendants (i) prepared and disseminated the PPM dated October 18, 2018, which affirmatively presented HFZ as a qualified developer while omitting any disclosure of HFZ's 140+ lawsuits, EB-5 project failures, and internal fraud; (ii) minimized the significance of the Harbourside litigation—filed seven days before the PPM—by dismissing the claims as "without merit" when the Harbourside complaint in fact alleged a "carefully planned fraud" by Mastroianni II; (iii) continued to solicit investments through Supplement No. 1 dated May 20, 2019 without disclosing the February 2019 RICO lawsuit against Mastroianni or HFZ's worsening financial distress; (iv) admitted in the PPM that they "have [not] undertaken any independent investigation to confirm the accuracy or completeness" of HFZ's financial information—a deliberate decision to remain ignorant that itself concealed the true state of affairs from Investors; and (v) stated in the PPM that it superseded and replaced "any and all information delivered or made available by or on behalf of the Company prior to the date of this Memorandum," thereby channeling Investors away from independent investigation and toward sole reliance on the PPM's

misleading disclosures.

97. These affirmative acts of concealment prevented Plaintiffs—who are foreign nationals with limited familiarity with U.S. court records—from discovering the facts giving rise to their claims until, at the earliest, the defaults and foreclosure proceedings that commenced in October 2020. The full scope of HFZ's criminal conduct at this very Project was not publicly confirmed until the Manhattan DA's indictment on February 7, 2024, and HFZ's guilty plea on August 6, 2024. These claims are timely.

98. To the extent any statute of limitations might otherwise bar any claim herein, the USIF Defendants are estopped from asserting the defense because they fraudulently concealed the facts giving rise to Plaintiffs' claims, as particularized in the preceding paragraph. In addition, the statute of limitations is equitably tolled because Plaintiffs reasonably relied on the competence and good faith of the USIF Defendants—who stood in a fiduciary relationship to Plaintiffs as the Manager, sponsor, and controlling persons of the Company—and because the USIF Defendants actively concealed material facts while Plaintiffs, as foreign nationals residing outside the United States, had no independent means of discovering Defendants' fraud and reasonably relied upon the USIF for such information. Under Delaware law, equitable tolling applies where a plaintiff reasonably relies on the competence and good faith of a fiduciary, and the fiduciary has concealed material facts that the plaintiff could not have discovered through the exercise of reasonable diligence. *See Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochemical Co.*, 866 A.2d 1, 7–8 (Del. 2005). Here, the fiduciary relationship between Defendants and the Investors, the PPM's representation that it superseded all prior information, the confidential nature of the offering, and Plaintiffs' status as foreign nationals with limited access to U.S. litigation records establish all prerequisites for equitable tolling. The tolling period extends at

least through the UCC foreclosure sale on April 23, 2021, when Plaintiffs first learned the full extent of their losses, and through the Manhattan DA's indictment on February 7, 2024, and HFZ's guilty plea on August 6, 2024, when the full scope of HFZ's criminal conduct at this Project was publicly confirmed.

**CLASS ACTION ALLEGATIONS**

99. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities who purchased or acquired Units in the Company pursuant to or traceable to the Offering Documents during the period from October 18, 2018 through April 23, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, their officers, directors, agents, affiliates, and their immediate families and legal representatives, heirs, successors, and assigns.

100. Numerability. The members of the Class, most of whom are believed to be overseas, are so numerous that joinder is impracticable. The PPM contemplated the sale of up to 160 Units.

101. Commonality. Common questions of law and fact exist as to all Class members and predominate over individual questions, including: (a) whether Defendants made material misrepresentations or omissions; (b) whether Defendants acted with scienter; (c) whether the Investment was impaired from inception; (d) whether Defendants' conduct caused the Class's losses; and (e) the appropriate measure of damages.

102. Typicality. Plaintiffs' claims are typical of the Class. Each Plaintiff invested pursuant to the same Offering Documents and each Plaintiff's investment was rendered worthless by the same events.

103. Adequacy. Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel.

104. Predominance and Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10b-5 (Against the USIF Defendants)

105. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

106. This Count is asserted against all Defendants and is based upon Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

107. The Units in the Company constitute "securities" within the meaning of Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10).

108. Each of the USIF Defendants, individually and as specified in paragraphs herein, by the use of means and instrumentalities of interstate commerce, the mails, and/or facilities of national securities exchanges: (a) employed or caused to employ devices, schemes, and artifices to defraud; (b) caused others to make or made untrue statements of material fact and omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs and the Class, in connection with the purchase and sale of the Units.

109. Specifically, each of the USIF Defendants made or is responsible for the following material misrepresentations and omissions, with their individual roles specified as

follows:

(a) Mastroianni II, as the person who selected HFZ as developer, signed or caused to be signed the PPM, and approved all material decisions, is directly responsible for the misrepresentations and omissions in the Offering Documents described in paragraphs 38–48.

(b) Mastroianni III, as the person who developed and managed marketing materials and disseminated them to foreign agents, is responsible for conveying the PPM's misrepresentations to the foreign agents who directly solicited the Class.

(c) the Mastroiannis in their supervision of Giresi, who as the General Counsel drafted, reviewed, and approved the PPM and who had primary responsibility for due diligence and compliance, are ultimately responsible for the legal sufficiency of the disclosures and for the failure to disclose HFZ's litigation history and financial distress.

(d) the Mastroiannis in their supervision of Friedman, who as CFO reviewed and approved the financial representations in the PPM, are ultimately responsible for the misrepresentations concerning the Project's financing, the appraised value, and the financial viability of the Investment.

(e) USIF and the Manager, each controlled by the Mastroiannis, are responsible for all statements in the PPM because the PPM was issued by and on behalf of these entities.

110. Each of the USIF Defendants acted with scienter, as set forth in particularized detail herein (old 49-55). The strong inference of scienter arises from: (a) each of the USIF Defendants' access to and knowledge of material information about HFZ's litigation history and financial distress; (b) the concrete, personal financial benefit each of the USIF Defendants derived from the fraud through fee-based compensation; (c) the Harbourside litigation, filed seven days before the PPM, alleging a substantially identical fraud by the same Defendants;

(d) the magnitude and obviousness of the omissions; and (e) the PPM's own admission that Defendants did not independently investigate HFZ's financial information.

111. Plaintiffs and the Class reasonably relied upon the USIF Defendants' misrepresentations and omissions. Because this is predominantly an omissions case, Plaintiffs are entitled to the presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972). Both elements are satisfied here: the USIF Defendants had a duty to disclose HFZ's litigation history, financial distress, and criminal misconduct by reason of their fiduciary relationship, their role as sponsors and managers, and the securities laws; and the omitted information was material because no reasonable investor would have invested $560,000 in an unsecured preferred equity position in a project developed by a company facing over *140 lawsuits* and an active criminal enterprise. In addition, to the extent the complaint also pleads affirmative misrepresentations, Plaintiffs and the Class relied on those misrepresentations in making their investment decisions, and such reliance was reasonable given the confidential nature of the PPM, Plaintiffs' status as foreign nationals with limited familiarity with U.S. court records and reliance on the USIF Defendants for such information, and the PPM's representation that it superseded all prior information.

112. The USIF Defendants' misrepresentations and omissions were the proximate cause of Plaintiffs' losses. Under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005), a plaintiff must allege that the defendant's deceptive conduct caused the claimed economic loss. Loss causation is satisfied where the complaint alleges "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

113. Here, Plaintiffs do not allege that the mere inflation in the price of the Units

caused their loss; rather, Plaintiffs allege that the very risks concealed by Defendants—HFZ's proclivity for criminal misconduct, financial distress, litigation history, and the absence of construction financing—materialized and caused the total loss of the Investment. If anyone was in a position to learn about these things, it was the USIF Defendants. They instead consciously avoided even the most cursory of views over the financial carnage they knew was occurring.

114. The Project's failure was caused by pre-pandemic structural deficiencies and by HFZ's criminal conduct, not by the COVID-19 pandemic. As alleged in detail, HFZ's lien law theft at this very Project began in 2018, two years before the pandemic; the financing gap exceeded $1 billion before the pandemic; and the appraised value rendered the Investment impaired from inception. COVID-19 is a convenient excuse for otherwise wrongful conduct. COVID-19 did not independently cause these losses; it was at most a concurrent event that occurred alongside a project that was already doomed to fail.

115. As a direct and proximate result of the USIF Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in an amount to be determined at trial, but not less than $89,600,000 in the aggregate. Each of the USIF Defendants are jointly and severally liable.

**COUNT II: FRAUD AND FRAUDULENT CONCEALMENT**
**(Against the USIF Defendants — Delaware Law)**

116. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

117. The USIF Defendants made false representations of material fact to Plaintiffs and the Class in the Offering Documents and in oral communications, as set forth in particularized detail in paragraphs 38–48 above. For each misrepresentation, Plaintiffs have identified the specific Defendant responsible, the specific statement, the date, and the manner in which the statement was false or misleading, thereby satisfying the "who, what, when, where, and how"

requirements of Rule 9(b).

118. The USIF Defendants knew or believed the representations were false, or made the representations with reckless indifference to their truth or falsity, as set forth in particularized detail in paragraphs 49-104, *supra*.

119. The USIF Defendants made the false representations with the intent to induce Plaintiffs and the Class to invest in the Company and to refrain from seeking alternative investments or demanding additional protections.

120. In addition, the USIF Defendants actively concealed material facts from Plaintiffs and the Class, including facts concerning HFZ's extensive litigation history, multiple EB-5 project failures, internal fraud, financial distress, and the impairment of the Investment. The USIF Defendants had a duty to disclose these facts by reason of their fiduciary relationship with the Investors, their role as sponsors and managers of the Company, and the securities laws applicable to the sale of the Units.

121. Plaintiffs and the Class acted in justifiable reliance upon the USIF Defendants' false representations and concealment.

122. As a direct and proximate result of the USIF Defendants' fraud and fraudulent concealment, Plaintiffs and the Class suffered damages in an amount to be determined at trial, but not less than $89,600,000 in the aggregate, plus consequential damages including lost immigration benefits and other harm.

**COUNT III: NEGLIGENT MISREPRESENTATION**
**(Against All Defendants — Delaware Law)**

123. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

124. The USIF Defendants owed a duty to Plaintiffs and the Class to provide accurate

information in connection with the sale of the Units, by reason of the USIF Defendants' role as sponsors, managers, and controlling persons of the Company and as fiduciaries to the Investors, and by reason of the securities laws applicable to the offer and sale of the Units. This duty arose independently of any contractual obligation and is grounded in each of the USIF Defendants' special position of trust and confidence as USCIS-designated regional center sponsors who solicited investments from foreign nationals with limited familiarity with U.S. real estate markets, securities laws, and legal protections.

125. The USIF Defendants supplied or caused to supply false information for the guidance of Plaintiffs and the Class in their business transactions—specifically, their investment decisions—as set forth in particularized detail in paragraphs 38-48 and 49-69, *supra*. The USIF Defendants failed to exercise reasonable care or competence in obtaining or communicating this information, including by failing to conduct any independent investigation of HFZ's qualifications, litigation history, or financial condition, and by disseminating representations about HFZ's expertise and the Project's financial viability without verifying their accuracy.

126. Plaintiffs and the Class justifiably relied on the USIF Defendants' representations in making their investment decisions. Plaintiffs' reliance was justified because: (a) the USIF Defendants were fiduciaries who owed a duty of candor to the Investors; (b) the PPM stated that it superseded and replaced all prior information, channeling Investors toward reliance on the PPM; (c) Plaintiffs were foreign nationals with limited familiarity with U.S. court records and were not in a position to independently verify the accuracy of the USIF Defendants' representations; and (d) the offering was a confidential private placement in which Investors reasonably expected that the sponsor had conducted adequate due diligence.

127. As a direct and proximate result of the USIF Defendants' negligent

misrepresentation, Plaintiffs and the Class suffered pecuniary loss in an amount to be determined at trial, but not less than $89,600,000 in the aggregate, plus consequential damages including lost immigration benefits and other harm.

**COUNT IV: BREACH OF FIDUCIARY DUTY**
**(Against the USIF Defendants — Delaware Law)**

128. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

129. The USIF Defendants owed fiduciary duties to Plaintiffs and the Class by reason of their role as Manager, sponsor, and controlling persons of the Company. The Operating Agreement and the PPM created a fiduciary relationship requiring the USIF Defendants to act in good faith, exercise due care, and place the Investors' interests above their own.

130. Each of the USIF Defendants breached their fiduciary duties by: (a) failing to conduct any independent due diligence on HFZ despite the PPM's own admission that they did not; (b) deploying Investors' capital into a structurally subordinate preferred equity investment without adequate protections; (c) placing their own fee-driven interests above Investors' interests; and (d) concealing material information from Investors.

131. The USIF Defendants' breaches constituted bad faith, intentional misconduct, and/or knowing violation of law, and therefore are not subject to the exculpation clause. 6 Del. C. § 18-1101(e). The particularized facts demonstrating bad faith are set forth in paragraphs 49-88, *supra*.

132. As a direct and proximate result of Defendants' breaches, Plaintiffs and the Class suffered damages not less than $89,600,000 in the aggregate.

**COUNT V: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (Against Mastroianni II and Mastroianni III— Delaware Law)**

133. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

134. To the extent the fiduciary duties ran only to the Manager and/or USIF, the individual USIF Defendants—the Mastroiannis —knowingly induced and/or actively participated in the breaches.

135. Each one of the Mastroiannis had a personal financial stake in the misconduct that was separate from and adverse to the interests of the Manager and USIF. Mastroianni II personally controlled and received fees from the entities. Mastroianni III personally managed the marketing that generated the investments producing fees. Under the direct supervision of Mastroianni II, Giresi personally served as the gatekeeper for compliance and legal review. Also under the direct supervision of Mastroianni II, Friedman personally oversaw the financial representations. Each individual's participation was specific, knowing, and substantial.

136. The intracorporate conspiracy doctrine under Delaware law does not apply because each individual USIF Defendant had a personal financial interest separate from the corporate entities, and their conduct transcended the scope of their corporate agency. *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

137. As a direct and proximate result, Plaintiffs and the Class suffered damages not less than $89,600,000.

**COUNT VI: BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (Against the Manager and USIF — Delaware Law)**

138. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

139. The Operating Agreement, Subscription Agreement, and PPM constitute valid and enforceable contracts.

140. Pursuant to these contracts, the Manager agreed to: (a) operate the Company in compliance with the EB-5 Program; (b) deploy capital contributions in accordance with EB-5 protocols; (c) fund the Investment only upon satisfaction of specified conditions, including that "the Project Owner shows to the Manager's satisfaction that it has procured commitments for all of the financing for the projected cost of the Project"; and (d) act in good faith.

141. The phrase "to the Manager's satisfaction" does not vest unfettered discretion. Under Delaware law, the exercise of contractual discretion is subject to the implied covenant of good faith and fair dealing. *See Nemec v. Shrader*, 991 A.2d 1120, 1125–26 (Del. 2010) (holding that the implied covenant requires that a party's exercise of discretion be consistent with the reasonable expectations of the other party). Defendants exercised their discretion in bad faith by deploying Investors' capital when they knew or were reckless in not knowing that the Project Owner had not procured commitments for the $1.325 billion in required financing—having obtained only $242,705,000, approximately 18.3% of the total. This was not a good-faith exercise of managerial discretion; it was an arbitrary and unreasonable act driven by Defendants' desire to earn fees. No reasonable investor would have understood the phrase "to the Manager's satisfaction" to authorize the Manager to deploy $80 million of Investors' capital into a project that had secured less than one-fifth of its required financing, developed by a company entrenched in over 140 lawsuits, while the Manager simultaneously collected millions in fees contingent on that deployment.

142. The Manager and USIF also breached the implied covenant of good faith and fair dealing by deploying capital into a project with a developer known to be in financial distress,

without adequate protections, for the purpose of earning fees. Under Delaware law, the implied covenant prohibits arbitrary or unreasonable conduct that deprives the other party of the fruits of the bargain.

143. Plaintiffs performed all obligations, including paying the full offering price of $560,000 per Unit.

144. As a direct and proximate result of Defendants' breaches, Plaintiffs and the Class suffered damages not less than $89,600,000 in the aggregate.

**COUNT VII: UNJUST ENRICHMENT**
**(Against the USIF Defendants — Delaware Law; Pleaded in the Alternative)**

145. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

146. This Count is pleaded in the alternative to Count V, to the extent the Court determines that the express contracts do not govern the specific subject matter at issue—namely, the receipt by the USIF Defendants of fees and compensation through fraud and misconduct that was outside the scope of any contractual authorization.

147. Benefits were conferred on the USIF Defendants by Plaintiffs and the Class. Each Investor invested at least $560,000, of which $60,000 was paid directly to Defendants as an administrative fee. The USIF Defendants also received placement fees, origination fees, management fees, and other compensation funded by Investors' capital.

148. It would be inequitable for the USIF Defendants to retain these benefits given that they were obtained by means of misrepresentation, concealment of material facts, and breach of fiduciary duty.

149. As a direct result, Plaintiffs and the Class suffered damages to be determined at trial.

**COUNT VIII: EQUITABLE ACCOUNTING**
**(Against All Defendants — Delaware Law)**

150. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

151. The USIF Defendants, as fiduciaries and managers of the Company, received and controlled substantial funds belonging to Plaintiffs and the Class, including $80,000,000 in capital contributions and $9,600,000 in administrative fees. The USIF Defendants also received placement fees, origination fees, management fees, and other compensation from the Project Owner and its affiliates in connection with the Investment, the full extent and disposition of which is known to the USIF Defendants but not to Plaintiffs.

152. Plaintiffs lack an adequate remedy at law because they do not have meaningful, objective access to the books, records, and financial information necessary to determine the full amount of fees, compensation, and profits received by Defendants and the disposition of Investors' capital. The complexity of the multi-layered entity structure through which the USIF Defendants operated—involving the Company, the Manager, USIF, the Holding Company, the Project Owner, and various affiliated entities—renders an accounting necessary to determine the amounts owed to Plaintiffs and the Class.

153. Plaintiffs are entitled to an equitable accounting of all fees, compensation, profits, and other amounts received by each of the USIF Defendants in connection with the Company, the Investment, and the Project, and of the disposition of all capital contributions made by Plaintiffs and the Class.

**COUNT IX: CIVIL CONSPIRACY**
**(Against Mastroianni II and Mastroianni III — Delaware Law)**

154. Plaintiffs repeat and reallege each and every allegation contained in the preceding

paragraphs as though fully set forth herein.

155. The Mastroiannis, acting in concert and with a unity of purpose, conspired among themselves to commit the wrongful acts alleged herein, including fraud, fraudulent concealment, and breach of fiduciary duty.

156. The intracorporate conspiracy doctrine does not bar this claim because each of the individual USIF Defendants acted with a personal financial interest independent of and adverse to the corporate entities, and because the underlying torts were committed through the personal, knowing participation of each individual Defendant. *See Braga v. Braga*, 995 A.2d 203, 206–07 (Del. Ch. 2010) (recognizing personal stake exception to intracorporate conspiracy doctrine). The personal stake exception applies because Mastroianni II personally controlled and received fees from the entities, in addition to his direct supervision of Giresi and Friedman; Mastroianni III personally managed marketing that generated fee-producing investments. Each individual USIF Defendant's financial interest in continuing the fraudulent scheme was independent of, and adverse to, the interests of USIF and the Manager.

157. In furtherance of the conspiracy, the individual USIF Defendants: (a) prepared and disseminated, or caused the preparation and dissemination of the PPM containing material misrepresentations and omissions; (b) solicited or caused the solicitation of investments based on those misrepresentations; (c) deployed capital without adequate due diligence or protections; (d) concealed material information; and (e) collected fees at the Investors' expense.

158. As a direct and proximate result, Plaintiffs and the Class suffered damages not less than $89,600,000.

**COUNT X: NEGLIGENT SUPERVISION**
**(Against the USIF Defendants — Delaware Law)**

159. Plaintiffs repeat and reallege each and every allegation contained in the preceding

paragraphs as though fully set forth herein.

160. Defendants owed a duty of care to Plaintiffs and the Class, arising from their role as sponsors and managers of an EB-5 investment vehicle and from the trust Investors placed in Defendants, to exercise reasonable care in the selection of the developer, the monitoring of the Project, and the management of the Company.

161. This claim is not duplicative of the breach of contract claim because it arises from an independent duty: the duty of a fiduciary and sponsor to supervise the entities and investments under its control. The economic loss doctrine does not bar this claim because the USIF Defendants' duty to supervise arises independently of the contractual relationship—from their role as USCIS-approved regional center sponsors, from the fiduciary relationship inherent in the EB-5 program structure, and from the special trust and confidence reposed in the USIF Defendants by foreign national investors who lacked independent means of evaluating the developer or the Project. The USIF Defendants' duty to supervise arose from their status as USCIS-designated regional center sponsors—a regulatory designation that imposed obligations independent of any private contract—and from the fiduciary relationship between the USIF Defendants and the Investors. Under Delaware law, the economic loss doctrine does not bar tort claims where, as here, the defendant owed a duty independent of any contractual obligation.

162. The USIF Defendants breached their duty of care by: (a) failing to conduct adequate due diligence on HFZ; (b) failing to monitor the developer's financial condition; (c) failing to ensure adequate financing before deploying capital; and (d) failing to take timely action to protect Investors' capital when HFZ's distress became apparent.

163. As a direct and proximate result, Plaintiffs and the Class suffered damages not less than $89,600,000.

**COUNT XI: FRAUDULENT INDUCEMENT OF THE 2020 CONSENT RELEASE**
**(Against the USIF Defendants — New York Law)**

164. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

165. This Count is governed by the law of the State of New York pursuant to Section 17 of the Escrow Agreement, which selects New York law under N.Y. Gen. Oblig. Law § 5-1401 for all controversies arising under, in connection with, or in relation to the Escrow Agreement. The Consent was solicited and executed for the purpose of authorizing the release of escrowed funds and therefore arises in connection with the Escrow Agreement.

166. The USIF Defendants made material misrepresentations of then-existing fact to Plaintiffs and the Class in the October 2020 Letter, as set forth in particularized detail above, including that the job-creation requirement had been satisfied for all current investors and verified by an independent construction management firm; that USCIS deemed the Project approved and that subsequent I-526 petitions would receive deference; that the Developer had invested $140,000,000 of equity into the Project; and that the I-526 petition insurance remained active.

167. These representations were false when made. The USIF Defendants knew them to be false, or made them with reckless disregard for their truth. The representation concerning insurance is contradicted by the USIF Defendants' own PPM at page 112.

168. The USIF Defendants made these representations with the intent to induce Plaintiffs and the Class to execute the Consent, to authorize the release of escrowed funds, and to forbear from asserting claims and from demanding the return of their capital.

169. Plaintiffs and the Class justifiably relied upon these representations in executing the Consent. The facts misrepresented were peculiarly within the knowledge of the USIF

Defendants and were not reasonably available to Plaintiffs, who are foreign nationals residing outside the United States. No specific disclaimer of reliance addressed to these representations appears in any of the Offering Documents.

170. The fraud alleged in this Count is separate and distinct from the subject matter of the Consent. The Consent purports to release claims arising from the 2018 Offering. The misrepresentations alleged here were made on October 27, 2020, concerned then-present facts that did not exist in 2018, and were made for the specific purpose of procuring the Consent itself. Plaintiffs therefore satisfy the requirements of *Centro* and *Pappas*.

171. As a direct and proximate result of the USIF Defendants' fraudulent inducement of the Consent, Plaintiffs and the Class were induced to release escrowed funds that would otherwise have been returned to them, and were induced to execute a purported release of claims. Plaintiffs and the Class are entitled to rescission of the Consent, to a declaration that the Consent is void and of no force or effect, and to damages in an amount to be determined at trial, together with punitive damages by reason of the USIF Defendants' willful and wanton conduct.

172. In the alternative, and to the extent the Consent is not rescinded in its entirety, the Consent was not "fairly and knowingly made" within the meaning of *Mangini v. McClurg* and does not reach the claims asserted in this Complaint, each of which was unknown to Plaintiffs at the time of execution and none of which was within the contemplation of the parties.

**COUNT XII: BREACH OF CONTRACT — TRI-PARTY RECOGNITION AGREEMENT**
**(Against Otera Capital Investments IX Inc.)**

173. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

174. The Tri-Party Recognition Agreement dated July 15, 2019, as joined by 29th and

5th Funding 100, LLC pursuant to the Joinder dated December 14, 2020, constitutes a valid and enforceable contract between and among Otera (as Administrative Agent), the Mezzanine Lender, and the EB-5 investor entities (as Investors).

175. Pursuant to the Tri-Party Agreement, Otera was obligated to: (a) prior to taking any Enforcement Action under the Senior Loan Documents, provide written notice of the default to the Investors (Section 7(a)); (b) if the default was a monetary default, permit the Investors an opportunity to cure such monetary default within the Monetary Cure Period (Section 7(b)); (c) upon the occurrence of a Purchase Option Event—including acceleration of the Senior Loan or commencement of any Enforcement Action—provide written notice of such event to the Investors (Section 9(a)); and (d) ensure that any foreclosure or transfer of the Property or the Collateral was conducted in a time and manner such that the Investors would have at least ninety (90) days after receipt of notice of the Purchase Option Event to close the purchase of the Senior Loan and the Mezzanine Loan (Section 9(b)).

176. Otera breached the Tri-Party Agreement by, upon information and belief: (a) failing to provide timely and adequate written notice to the Investors of defaults under the Senior Loan Documents prior to taking Enforcement Action, in violation of Section 7(a); (b) failing to afford the Investors the contractually required Monetary Cure Period with respect to monetary defaults under the Senior Loan, in violation of Section 7(b); (c) upon accelerating the Senior Loan on or about December 1, 2020—thereby triggering a Purchase Option Event under Section 9(a)(i)—failing to provide timely written notice of such Purchase Option Event to the Investors as required by Section 9(a); and (d) failing to ensure that the UCC foreclosure sale of the Collateral conducted by the Mezzanine Lender on April 23, 2021 was done in a time and manner such that the Investors had at least ninety (90) days after receipt of notice of the Purchase

Option Event to close the purchase of the Senior Loan and the Mezzanine Loan, in violation of Section 9(b).

177. To the extent that Otera contends it complied with its notice obligations by issuing its December 1, 2020 notice of default, Plaintiffs allege, upon information and belief, that such notice did not satisfy the specific procedural requirements of the Tri-Party Agreement because: (a) the notice was directed to Borrower and did not constitute a Default Notice to the Investors as required by Section 7(a); (b) the notice did not afford the Investors the Monetary Cure Period required by Section 7(b); and (c) the notice did not constitute or trigger the Purchase Option Event notice required by Section 9(a), as it failed to provide the Investors with notice of their right to purchase the Senior Loan and Mezzanine Loan at the Loan Purchase Price.

178. Otera's breaches caused damages to the Investors. Had Otera complied with its obligations under Sections 7 and 9 of the Tri-Party Agreement, the Investors would have had the contractual right and opportunity to cure monetary defaults under the Senior Loan and to purchase the Senior Loan and Mezzanine Loan for the Loan Purchase Price, thereby preventing the UCC foreclosure sale that eliminated the Investors' entire preferred equity position. By depriving the Investors of these contractual protections, Otera's breaches were a proximate cause of the total loss of the Investment.

179. Pursuant to Section 22 of the Tri-Party Agreement, the parties acknowledged that a breach of the Agreement would cause irreparable harm and that the non-breaching party would be entitled to equitable relief, including injunction, declaratory judgment, and specific performance, in addition to any and all other remedies at law or in equity.

180. As a direct and proximate result of Otera's breaches of the Tri-Party Agreement, Plaintiffs and the Class suffered damages in an amount to be determined at trial, but not less than

$89,600,000 in the aggregate, and are additionally entitled to equitable relief pursuant to Section 22 of the Tri-Party Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that this Court:

A. Certify this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), appoint Plaintiffs as Class Representatives, and appoint Cornish & Associates as Class Counsel;

B. Award Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally or otherwise, in an amount to be determined at trial, but not less than $89,600,000;

C. Award Plaintiffs and the Class pre-judgment and post-judgment interest at the maximum rate permitted by law;

D. Award Plaintiffs and the Class their reasonable attorneys' fees, costs, and expenses incurred in this action;

E. Award Plaintiffs and the Class disgorgement of all fees, compensation, and profits received by Defendants in connection with the Company and the Investment;

F. Award Plaintiffs and the Class punitive damages as permitted by law;

G. Impose a constructive trust over all fees and compensation received by Defendants in connection with the Company and the Investment;

H. Award Plaintiffs and the Class damages against Otera Capital Investments IX Inc. for breach of the Tri-Party Recognition Agreement, together with equitable relief including injunction, declaratory judgment, and specific performance as provided by Section 22 of the Tri-

Party Agreement;

I. Order an equitable accounting of all fees, compensation, profits, and other amounts received by Defendants in connection with the Company, the Investment, and the Project, and of the disposition of all capital contributions made by Plaintiffs and the Class; and

J. Award such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: July 28, 2026

Respectfully submitted,

**LAW OFFICES OF ROBERT V. CORNISH, JR., PC**

/s/ *Robert V. Cornish Jr.*
ROBERT V. CORNISH JR. (4755104)
32 Mercer Street, 5th Floor
New York, NY 10013
Tel: (307) 264-0535
Fax: (571) 290-6052
rcornish@rcornishlaw.com

*Attorney for Putative Class Plaintiffs*